and I'd like to reserve three minutes for rebuttal if I may, so you can set the timer for seven, I suppose, or do I do it up here? No, we can't really reset it, but you can watch it, and I won't make a promise, but I'll try to remind you, although it's really up to you to stop before your time's up. Thank you, Your Honor. Good morning. May it please the Court. Jose Vera on behalf of the appellants Jerry Dawson, David Emery, Byron Foltz, and Shelley Saga. This appeal arises from a search for evidence of rat harborage and violations of SMC 1034 et al. at the residence of 6420 and 6418 on September 30, 1999. The issues before the Court that arise out of that nucleus of facts are, first, whether there is sufficient specificity and narrow tailoring of the information supporting the warrants to render them constitutional. Do we agree that this is a criminal warrant? Yes, Your Honor, we do agree these are criminal warrants. There really has been no disagreement about that, and I'll get to that. That is really the hub of what we're going to talk about here in a few minutes. The second issue obviously then flows from that, which is the improper execution of those warrants, and then lastly, the main issue is whether the detention should have occurred in the first instance, and if this Court concludes that it should have, whether it was reasonably tailored to meet the circumstances presented to the officers at the scene. And then last is, I think, a minor issue here, but if the Court wants to discuss it, does municipal liability flow if any of these other issues yield some type of unconstitutional conduct or some type of defective behavior? This is before us on a summary judgment. Yes, Your Honor. So the real question is whether there's an issue of fact. Absolutely. As to whether there are any violations of the Constitution that could yield a liability of the appellees. Absolutely, Your Honor. All right. And were there cross motions for summary judgment or just motions of the defendants? There were actually cross motions for summary judgment. So I guess at a minimum here, the question for us as appellants is whether there's an issue of fact. As I'll discuss, I think at least as to the probable cause issue supporting the warrants, I think that can be reviewed de novo, and I think the Court can make a ruling as a matter of law right here, and I'll get to that in the next phase here. The primary issue, I think, follows up on your question, whether this is a criminal inspection warrant, is when you look at the ordinance at issue and you look at what parts of that ordinance are criminalized, the critical features of that, if you look at 1034.030 and I believe 0.2.0 are the actual provisions or conduct that's been criminalized. What you'll see as you look at that statute or ordinance is what's criminalized in 0.3.0 is a failure to comply with the director's order or some type of corrective notice. And then the next provision. Well, I thought there's a provision that on its face at least makes it unlawful to maintain a place that's infested. No, Your Honor, there is not. And that's what we've argued in our briefing and what I'd like to get us focused on here today, that when you look at 0.3.0, what you'll see, and I think this is of critical importance, you'll see all premises and places shall be maintained free from rats, mice, and other rodents, semicolon, and then it says what should be unlawful. So the mere presence of mice, rats, and rodents in and of itself, although I think highly discouraged in residents and buildings, is not in and of itself unlawful. My recollection is that I think even the new federal courthouse had a rat problem. I think the mere presence of rats there didn't render that unlawful. I have a personal experience where they closed the dump by the University of Washington many years ago. All the rats came to Laurelhurst. That's right. And we all had rats. That's right. That's right. And that happens. And so the mere presence of rats, the mere presence of rodents, I should say, in and of itself, isn't what's unlawful under the ordinance. What's unlawful under the ordinance is a failure to take some type of corrective action pursuant to a director's letter. When you look at then. Okay. I'm going to take another look at the ordinance, but I'll just tell you. I was under the impression that, yes, it's unlawful if you don't follow an order. Right. And, of course, the mere presence of a rat wouldn't create a criminal liability, but that there could be a liability for failing to maintain a place properly, whether or not you ever got an order to clean it up. Right. And let's talk about that, because that's the next section. Am I right about the literal language of the statute? I beg your pardon, Your Honor? Am I right that the literal language of the ordinance would cover, as criminal, certain conduct in failing to properly maintain a place free of rodents? No. That's not correct. The critical language, when you look at it, it's ER, and our material is 273. The code section is 020. And it says, It shall be unlawful for the owner or occupant to fail to reconstruct or repair, not just having an existing structure. And so what you see there is if there's actual entrance issues or the property is becoming disrepair, and, again, I think you get a directive to repair or reconstruct the premises, and you fail to do so in the way prescribed, using the materials prescribed, that's unlawful. What's interesting is if you look at 020, you see at the bottom of that provision, you know, a reference that the director or one of their delegees may investigate the premises at a reasonable time. I would offer that that's an administrative-type inspection, but that's not a criminalized-type inspection. I think the critical distinction here is that if we were looking at truly criminalized conduct, the warrant in this instance would have been sufficiently narrowly tailored, meaning if there were a letter from the director saying, this is what you need to do to remedy the situation or this is the cleanup you need to undertake to remedy this, that information would have been included in the warrant, would have been included in the application. That would, again, given the inspecting officers sufficient guidance to know exactly what to search, as well as the individuals to know what would be searched. Here's the language I was thinking of. I now see it in the court's order denying your motion.  For summary judgment. It's 10.34.030. It states, all premises and places shall be maintained free from rats, mice and other rodents. And then it's got a semicolon.  And then it says, and it shall be unlawful for the owner to fail to take, you know, preventive. Right. And that seems conjunctive so that at least it literally seems like it's, you know, and it shall be unlawful to not take these remedial measures. I think if we were seeing. What about the first prohibition that you just have to maintain it free from rats? I think if we're seeing something less than a semicolon, and I hate to get into an argument over grammar per se, no punctuation, maybe in a comma, that argument begins to carry a little more weight. But I think that the legislative body here could have easily said, started off the whole section of provision with, it shall be unlawful to fail to maintain premises free from rats, mice and rodents, and to follow director's order. That would have been an easy remedy here. I think this court, as all courts must do, is deal with the ordinance at issue and see this to say, we're seeing what is deemed unlawful. And this legislative body took some pain to narrowly tailor that. But, again, that makes some sense because they close down a dump and all of a sudden you have mice and rodents migrating. Are you now in criminal violation of the health code when you've done nothing, you've done no conduct? As opposed to here, once you receive the director's order, you've had some opportunity to take some remedial measure, and failing to do that is what becomes unlawful. Now, I see I'm short of time. And is there any other questions? I think this Court would probably want to ask a few, but. There are some others I'd like to hear you comment on, so we'll add three or four minutes to your time. Okay. I would be interested in your view. I understand you think there's not probable cause supporting the warrant. If there's probable cause, however, would you address whether it's too broad a language? Yes. I think it is, again, far too broad, because what we see in the warrant is the director to search for any violation of the Seattle Municipal Health Code. And I think that fails to give any reasonably trained officer any type of directive as to what items are to be searched and how far may their investigation or search go in the execution of that warrant. Okay. Well, here I thought the search was to be conducted by the public health officials. Correct. And so they knew what they were looking for. Correct. But the standard for warrants is not just that the searching officer be aware of what they're looking for, but also that the individual whose residence is being searched, whose privacy and constitutional rights in their home know what is the scope of that warrant. Was the supporting affidavit served with the warrant? Do you know? I understand that it absolutely was served with the warrant. Yes. So would the supporting – I mean, there are cases that say that when we're considering whether the discretion is properly constrained and whether notice is properly given, that we consider the affidavit that supports the warrant, too. The problem here is that the supporting declaration of Richard Coppock and the statements of Lee and Lasby, the health care inspectors, are equally as broad as the warrant themselves. I mean, they really say you can search anything here. This is a wide-scale issue and problems rampant throughout the premises. Again, the problem with this is it doesn't give the individual whose residence is being searched any sense of what is to be searched. The concern I would have is that without the requisite specificity, we can sit here six years after the event and begin to read into probable cause, begin to read into the breadth where really the warrant ought to define the contours of the permitted violation of the individual's constitutional rights so everyone knows up front what the game is. And that's my concern in this instance. And as we get to the detention question, if we want to talk about some of the officer safety issues, that I think is equally apparent here. That same concern is a theme running through this case. I think it would be good if you could at least address, and we'll extend time for the appellees also, but if you could address two other issues before you sit down. Yes. One, address the scope of the detention, which obviously, I mean, I'm quite familiar with the Ganwich case. I'm sure the panel's familiar as well with these principles. And we'd like to hear, you know, how you think it's related and also how it might be distinguished. But then also there are issues here of Monell and whether the city could be liable on a policy basis. Yes. I think you need to address that. The same with King County. Correct, Your Honor. Because even if the officials are wrong, don't poke at the city unless there's a policy that is.  Let me begin the discussion on detention, but I'm going to start off with a reference to policy, which will frame the distinction between, I think, this case and Ganwich, which is what you see on the policy side from the city, from the interrogatory answers from the chief of police, from the designated 30B6 speaking agent, and from officers Dornay, Zylack, and Bauer. You see a very consistent theme that the detention occurred because of a concern for officer safety. You see that resonate from stem to stern through the policymakers at the top to those who were conducting the detention themselves. And I think that is critical because in Ganwich, you have one of the distinctions in Ganwich is that there's a, as you recall, is there's a concern, is there going to be a destruction of evidence, meaning if you let some of these business employees go, they'll alert other off sites. They were partly detained in Ganwich so they wouldn't call up the other locations and, say, hide the evidence, the feds. Correct. Correct. Here, what we're seeing is some of the justification, again, six years after the fact it's being offered up, is we detained them in this way so they wouldn't go get outside assistance to endanger officer safety. And I think that's a critical distinction here. You're seeing Bauer say that. You're seeing Dornay and Zylack say that from the officers at the scene. Why that is critical, because we have in the record where they released one individual, Kay Reddy, and, again, remember they conducted the searches not simultaneous but in sequence, in a manner which if anyone from one house wanted to ambush the investigating officials from the other, they could have easily have done so. When you release Kay Reddy, she could have easily gone and summoned the assistance of any individual or any group of individuals. So, again, in Ganwich, the justification for the detention is to prevent the destruction of evidence. What we're seeing here in the record, the justification, is officer safety. But the problem with that is that they vitiate that argument by the officer's conduct at the scene. In other words, they released Kay Reddy, they conducted in sequence, and I think that's interesting is one of the threats that they kind of pound on, again, six years after the fact is an individual known as Mr. Keith Gilbert. Well, we have from the testimony of Hope Bauer that she was able to recognize this individual, yet we see no evidence. There's no evidence whatsoever from the officers at the scene that she's posted as a lookout for him, you know, once they determine he's not in the premises themselves, that she's not posted as a lookout. There's no evidence that there's any form of warning sign for Gilbert or any other group of individuals coming. Instead, everything focuses internally. The bottom line is the officer's conduct the day of the search fails to evidence once they enter the premises any concern, the kind of concern for the safety that's now being echoed in the briefing six years later. And I think that's the critical distinction between this case and Gantwich, because officer safety is the justification for the detention, as opposed to Gantwich. Okay. Well, we've gone way over your time. Yeah. We appreciate being alerted to your view on the issues. We'll add another minute for rebuttal, even though you've gone over your time. I have another question. Go ahead. And that is the reasonableness. Let's say they couldn't detain them. What about the manner of the detention? They made them answer questions. They sent somebody out without shoes. I'd like to hear a little bit about that. Yeah. In this instance, that's completely unreasonable, meaning one of the themes running through the Summers-like detention case law is that the officers won't be tempted to use the detention to gather evidence of additional crimes. They'll be more focused on the search itself. But instead, what we see here is a questioning of names, identities, outstanding warrants. There would in itself be evidence of additional crimes, which violates the whole purpose of the justification of these types of detentions. So I think they are completely unreasonable, particularly given the State's interest here. We're not talking about a meth lab. We're not talking about, you know, a narcotics-type bus. We're talking about rats. You know, there was a time when about a third of the people in Europe died from the Black Plague. So there's a reason why every city in the United States has public health officials and why they try to stop rodents. And absolutely. And that's a well-founded basis, a well-founded policy. But this isn't the time of the Black Plague. And the search takes place in the context in which we live. And there's not a plague outbreak, and there wasn't in 1999. With all due respect, Your Honor, I'll go ahead and conclude my time. Thank you. Okay. Well, let's mark this up from 10 minutes to, I don't know, 15 minutes. Your Honor, we had previously discussed amongst ourselves where I'm representing the city. Come on up to the mic. Please come to the mic. First, I wanted to make sure that you wanted to discuss municipal liability prior to the remarks. You can do it in whatever order you want. I think we are going to want to hear about the municipal liability issues before we're done. Okay. Well, may it please the Court, my name is Heather Carr. And as I just indicated, I represent the city defendants, which only remain two, the city of Seattle and Chief Karlikowski. We're splitting the time, I understand, between the two of us, and we'd like to divide it equally. With respect to my clients, the plaintiffs have only essentially appealed to issues. Hold the mic up, would you? Yes. Okay. So your clients are the city of Seattle. And Gil Karlikowski, the chief of police. And the chief of police. Yes.  And with respect to my clients, the plaintiffs have only appealed to issues. One was the allocation of costs, an award of costs to my clients by the district court. I'd like to rely on our briefing for that unless the court has any specific questions. And the other issue is collectively the municipal liability claim that was based on the detention that plaintiffs complained of. There's some question as to whether our motion for summary judgment was actually appealed. And, again, I'd like to rely on the briefing for that. Of course, our contention is it was not, and plaintiffs have only appealed their motion's denial. Of course, the city asked that the Ninth Circuit affirm the district court's rulings and the summary judgment motions are reviewed de novo, as the court previously indicated. This municipal liability claim must fail as a matter of law for several reasons, one of which is that plaintiffs cannot and have not established a constitutional deprivation. The decision to detain the individuals, as well as the circumstances of the detention, were entirely reasonable, based on the legitimate law enforcement interests at stake, as well as the articulable facts known to the officers prior to deciding to detain the individuals. There is no dispute about the record that the officers had information that would indicate that there were legitimate safety concerns at issue in these residences. What was that information that? Prior to deciding to detain the individuals, as Officer Hope Bower testified and as Sandy Coppock, Sandy Watson, excuse me, testified in their depositions, they knew that the properties were associated with an individual named Keith Gilbert, who is presently in the press right now for very violent behavior taking place in the boarding houses. But at the time, they knew that he was violent, that he had an extensive criminal history. Both of that is in the record before the court. What connection to the property did he have? Did they know what that connection was? Yes, they did. The properties are all owned by an individual named Hugh Sisley, and I believe his brother Drake Sisley. The properties as a collective group are managed, they believe, managed by Mr. Gilbert. Now, the individual properties have, I think, on-site managers who collect the rent and give it over to Mr. Gilbert, or Mr. Gilbert himself will come and recover the rent. The individual who was actually residing in the house at the time was Todd Aide, or Todd Aide, I'm not sure how to pronounce his name. But there was a definite connection with respect to that home. And in addition, the officers knew that DPH, Department of Health employees, had gone to that particular residence, I think it was 6418, on a different occasion when Mr. Gilbert showed up and threatened this individual with physical assault, verbally threatened them. And police officers had responded to take an incident report with respect to that action as well. They also knew that he was in the immediate area because he worked and resided in that Roosevelt area in those properties owned by Mr. Sisley. It was ---- Let's say that there was some concern because of Gilbert's connection to the property. Yes. Once they got there and they found he wasn't there, does the mix change? Well, one of the interests that the Summers Court noted, and I believe the Ganwich Court as well noted, is the fact that when you release individuals, they can go and destroy evidence and or go and get other people to come back and help interfere with the investigation. What if they're going to destroy rats or feces? This is not that kind of a case. Yes. No, I agree with you, Your Honor. What is the nexus there? Because in the Ganwich case, it was a fraud by a business operation that had multiple locations. And there was concern that if employees were released, they might call the president and he could call the other locations. Yes. But what here would be if these people had been released while the officials searched their rooming house, what is it they might have done? The concern wasn't that they would destroy the evidence of rat harbors or something like that. The concern was that they would go and enlist Mr. Gilbert to notify him of the search and ask him to come back where he would almost assuredly. But they did let somebody out, and the other house wasn't. They detained people kind of seriatim. Isn't that right? Yes. And at the time, I don't believe that the 6420 had knowledge that they were also subject to a warrant. I believe they started with 6418. Ms. Reddy did leave 6420. However, I would also point out that that evidence isn't properly before the court as the sole evidence of it is hearsay testimony by Mr. Addy or Mr. Aide that plaintiffs have submitted. So that's not actually properly before the court. In any case, the concern that Mr. Gilbert would be a threat is only one of other various concerns that the officers had that supported officer safety. Let me ask you to address another issue before half the time has gone. I'm sorry. You know, are the individual officers defendants here or just the city? The answer to that question, Your Honor, is no. The individual officers are not defendants. They were never named or identified and never made a party to this lawsuit. So assuming that individual officers unreasonably detained residents of the rooming house, what's the policy of the city of Seattle that is at stake here or that could create liability? Because we have to the city's not liable under Monel unless it had a policy that somehow ties it to the action. Exactly. If there is no municipal act, clearly there cannot be municipal liability. And plaintiffs have not submitted any evidence of a municipal act. What they have alleged is that the city has a mandatory policy of detention. But the testimony that they rely upon to establish that policy is the testimony of Lieutenant Kessler. And Lieutenant Kessler specifically testified that the officers are trained to detain if there are safety risks. Lieutenant Kessler also specifically stated that whether to detain is a case made by a case-by-case basis. There is no blanket policy. So under the evidence that the plaintiffs are trained to detain, there is no blanket  That's not quite what he said. He said ordinarily we would detain. He said, but forgive me, Your Honor, but he also said that this decision is made on a case-by-case basis. Detention is when there are safety concerns. Irrespective of whether there's a policy, I would also submit to the Court, though, that there is no causation, which is also a requisite element of municipal liability. All of the testimony in this case, all of the evidence in this case, establishes that the officers detained these individuals because they had safety concerns. There was also some testimony about wanting to have those individuals near in case they needed the individual personal property items unlocked, which is another basis for keeping individuals in detention during the execution of a search warrant. There is no evidence that they were detained pursuant to a mandatory policy, and that is what the district court correctly held. There is no reason to overturn its ruling. Okay. Thank you. Would you like to give Ms. Gallagher some time? Yes. Thank you very much, Ms. Carr. Ms. Gallagher, your clients are? Thank you, Your Honor. Yes, I'm Linda Gallagher. I represent the King County Defendants, Dr. Alonzo Plow, the Director of the Department of Public Health, Bill Lasby, the Supervising Inspector on the scene, and Perry Lee, the Investigator, who is also employed by Public Health, as well as the Chief Justice of the Department of Public Health, as well as King County, the entity on the Munnell claim. May it please the Court. The King County Defendants also ask that the Court affirm the district court's rulings granting summary judgment of dismissal in this case. Summary judgment was proper. There's no genuine issues of material fact in this case, and therefore the case was properly dismissed. With respect to the inspection warrants that were obtained from the Court, there was ample probable cause for those warrants. That's what the district court found as well, and the warrants were properly obtained and properly executed in this case. How about the issue of over-breath? With respect to the issue of over-breath, Your Honor, the warrants do have what could be called catch-all language under some of the other case law that say evidence of violations, but I think that ---- Of health code violations. Pardon? Evidence of health code violations. About health code violations. Of course, they had a very broad complaint about unhealthy conditions. Right. But I think it's not over-breath in this case. The other cases are distinguished because taken as a whole, the warrants here adequately describe the nature and scope of the inspections and provide meaningful guidance to the officers charged with their executions. And that's because it's not just the declarations of Mr. Lasby and Mr. Lee who went to the scene and made their own personal observations from the outside looking in, even though they were denied access to the inside of the buildings, but also from the long and very detailed and specific declaration of Richard Kopach, who was a professional exterminator with Terminex. He was the original complaining party. His declaration is not broad about any kind of violation. It's very specific, room by room, as he, with permission of one of the occupants of the properties, observed and provided treatment for infestations, including the rodent infestation and rodent harborage there, including observing fresh droppings and debris and rotting food. And his declaration spells it all out. But throughout the rooms and the accesses to the rooms, which were not rodent-proof, which showed what he thought was the worst evidence of rodent infestation and harborage he had seen in all of his years as an exterminator. So I think his declaration, coupled with his subsequent visits to the property to reset the rat traps, which he had set in the property, which he had been told had caught rats there, and also observe what other evidence is there. And by his third visit on September 3rd, he was convinced it was not going to change and they weren't going to have any other maintenance or service for it. So he reported to the city, the city attorney's office, together with my clients, discussed the situation, evaluated what they could do about it, and that ultimately led to both my clients' visit to the property to ask for a voluntary inspection, which, had it been allowed, may have resulted in some kind of corrective letter from the director of public health about what specifically should be done at this property to remedy the violation of failing to maintain the property free of rodent infestation. But that didn't happen, so they weren't allowed to be admitted. Now, what was the crime described as that they were going to seek evidence of? The violation of the rodent control chapter of the Seattle Municipal Code, that's 10.34. It's not the entire health code, but 10.34 provisions. Violation of any part of that code, according to the code in 040, is a misdemeanor crime. But you can be that broad in your warrant? I believe so, because the violation was that all premises and places shall be maintained free from rats, mice, and other rodents. There's additional unlawful language, but the fact that it shall be maintained, according to 10.34040, is a misdemeanor and is what the focus of this inspection was, both of the applications, the affidavits for the warrant, and the warrant itself, which did say violations of the health code, but it said it in the context of evidence including photographs and any other evidence of filth, debris, rodent, or insect infestation. What's the reason for not getting an administrative warrant? I think that the ‑‑ I'm not sure exactly the answer to that question, Your Honor. But I think that because the rodent control ordinance is a violation of that, is a criminal, is a misdemeanor, and the authority of the magistrate, Judge Halpert, was also under the court rule to provide a criminal warrant, that that is why the warrant was sought for specific violations that were actually observed by Mr. Kopach. If you were going to get an administrative warrant, what do you have to do? Do you have to go to a judicial officer to get an administrative warrant? I'm afraid, Your Honor, I don't know the answer to that question in the context of working on this case. I'm not sure. I don't know if it needs to be superior court or how that is. I know the municipal court can only issue criminal warrants because that's its jurisdiction. And that's what we did here. That's right. That's what you did. I'm sorry. I don't know the answer. I'll learn it now in the future. What would be the Monell issue as to your King County client? My understanding, and Mr. McPhara will correct me if I'm wrong, but my understanding is the only Monell claim against King County itself is their claim of inadequacy or failure of training to train Mr. Lee and Mr. Lasby for King County to formally train them about search and seizure, about Fourth Amendment. And our position is that that doesn't establish inadequate training and certainly doesn't rise to the level of the required deliberate indifference. But I think training is the only thing. So what we have in this case, which is undisputed, is that the county relies on the city attorney's office when investigating violations of their Seattle Municipal Code for assistance in training and guidance, both in obtaining and executing the warrants. There's a document in this case specifically called Guidance for Obtaining and Executing Search Warrants, prepared by Ms. Watson, specifically to train, to provide training in these particular warranted searches. And that's what happened in this case, and that's undisputed in the evidence. But there, back in 1999, there was not, at least, there was not a formal training provided to the officers, to Mr. Lee and Mr. Lasby. And I think that's what the plaintiff is claiming creates Monell liability. And we would submit that that falls far short of the legal requirements on that. Does the record show what happened after the searches were made? Yes, Your Honor. The record shows that they did not see the kind of evidence that was, to the extent, describing Mr. Kopach's declaration. They found one well-preserved rat and some old rat droppings, but not fresh rat droppings in the second home that they looked at. And that was all that they seized. Did they do anything about the premises? No. There was not any kind of violation filed based on that.  No. No, Your Honor. So they made a search, and that was it? That's right, Your Honor. They didn't prosecute any individual there about any drugs or anything. Is that right? With one exception where there was a consent to search for something that was found in the room of Ms. Soga by the police. No, she was not prosecuted either. But, no, there was no prosecution and no criminal charges to my knowledge, none certainly based on the rat control ordinance, and I don't think any others as well. Did they see some droppings or something like that? Yes, of rodents, of rats, yes. Did they give them back? No. No. To my knowledge, no, but that's on the record. Okay. Well. They may still be saved. We've gone over the time, but we've had a lot of issues. Is there anything you feel you need to add for your clients? No, just that we ask that you please affirm the district court in this case. Thank you. Mr. Vera, we're going to, even though you're over your time, we'll give you another minute. We can make it two minutes. Why don't you, I think you need to address the Monell liability issues. Yes. Because in some ways this would be a much easier case if we were dealing with a suit against the police officers who conducted the detention. Right. We don't have that here, right? Right. We don't. So I'd say why is the City of Seattle, what policy did they have that led to unreasonable detention, if this was, can be so characterized? And the same with the King County. What's your policy argument as to each? Yes, Your Honor. The policy argument with respect to the city defendant is what I alluded to earlier, which is a policy that can characterize throughout the evidence a sweep and detain. And by that, yes, we do have the testimony of Captain Kessler, the designated 30B6 speaking agent, talking about in the execution of any warrant that the general policy, the fundamental safety premise is to detain. That is then coupled, in other words, if that were the only evidence we had, that's one argument. But that's coupled with the interrogatory answers we have of the policymaker, Chief Gil Kerlikowske, which says the reason for the detention was officer safety. In reviewing the officer conduct, they did everything appropriate. It's the next answer right below that, I believe, or the preceding interrogatory answer. But it doesn't Michigan v. Summers allow some detention in connection with a search warrant so that if there's a general policy to detain, that's okay under Michigan v. Summers. The only issue is whether there was an unreasonable detention here that went beyond what should have been permitted. Well, I think the distinction here, and this is kind of critical and gets to a comment made by Ms. Carr in her presentation, is that the policy is to sweep and detain for officer safety. The problem is here was there's no articulable intelligence of any danger to officer safety other than the unknown. The proof is really in the pudding. Let's go two days prior to September 30, 1999. We sent two unescorted Department of Health inspectors to that same premises to conduct what would have been a surprise inspection. They would have been in there alone without any escort. So my question is, what is the intel that changes in two days? What is the, and I think really it's a day between the actual search and by the time they're back again. But what changed? Nothing changed. Well, they ran into some resistance, didn't they? No. All they were told is you don't have the consent to search, obtain a warrant. You're not going to be allowed in the premises. But that's well within the rights of the individual to say I'm not going to concede to this search, and I want to say no, and go get a warrant. There was no hostility to that. The concern, well, I'll tell you, the concern I have is the reference made to Keith Gilbert again six years after the fact. Okay, I think we understand that one. Sure, that's fine. But we're way over the time, and the panel has been very interested in the arguments of all the parties. Yes. We will study the issues in the briefs. Thank you, Your Honor. You have a very complete ruling on the issues, I hope. Thank you. Thank you. The case will be submitted. So Dawson v. City of Seattle submitted. We thank all counsel for their arguments. The Court will take a brief recess for 10 or 15 minutes now, and when we come back, we will address the remaining two cases.
judges: B. Fletcher, Gould, King